UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   Case No. 3:19-cr-30059-MGM |
| | ) |
| LUIS VELEZ, | ) |
| | ) |
| Defendant. | ) |

MEMORANDUM AND ORDER ON THE DEFENDANT'S MOTION TO COMPEL
DISCLOSURE OF WITNESS INFORMATION
(Docket No. 36)

ROBERTSON, U.S.M.J.

I.      INTRODUCTION

Defendant Luis Velez is charged by indictment with one count of being a felon in possession of a firearm and ammunition, in violation of 18 U.S.C. § 922(g)(1) (Dkt. No. 4). Defendant has indicated that he is likely to pursue a defense of entrapment and has moved to compel the government to disclose specific information concerning a confidential informant ("CI") who provided Defendant with the firearms and ammunition that form the basis for the indictment (Dkt. No. 36). The government has opposed the motion (Dkt. No. 44). After hearing from the parties on June 25, 2020, Defendant's motion to compel is ALLOWED IN PART for the reasons that follow.

II.      BACKGROUND

A.      Defendant's Alleged Crime

According to Defendant's sworn affidavit (Dkt. No. 40 at 37-41), which is accepted as true for purposes of this motion, *see United States v. Pesaturo*, 519 F. Supp. 2d 177, 184 (D. Mass. 2007), he met the CI in 2014 while they were incarcerated at MCI-Norfolk (Dkt. No. 40 at

1

37 ¶ 2).  Defendant states that he and the CI "became close in prison" and referred to each other as "'brothers'" (Dkt. No. 40 at 37 ¶ 3).  The CI recounted the "many violent crimes" he had committed, including "threats, use of firearms, and murder" (Dkt. No. 40 at 37 ¶ 3).

After the CI was released from state prison "sometime in the summer of 2015," he lived in New Bedford, Massachusetts (Dkt. No. 40 at 37 ¶ 4).  Defendant completed serving his sentence in November 2016 and moved to Springfield to live with his family (Dkt. No. 40 at 37 ¶¶ 4, 5).  The CI loaned Defendant money until he started earning a salary (Dkt. No. 40 at 37-38 ¶ 6).  Defendant and the CI talked by telephone "two to three times a week," communicated over social media, and occasionally socialized in New Bedford (Dkt. No. 40 at 38 ¶ 7).

Defendant claims that the CI attempted to convince him to "join him in illegal schemes and committing various crimes in New Bedford" (Dkt. No. 40 at 38 ¶ 8).  On one occasion in 2017, the CI asked Defendant to come to New Bedford to pick up his guns because the police had raided his house searching for drugs (Dkt. No. 40 at 38 ¶ 9).  Defendant consistently refused to participate in the unlawful activities that the CI proposed (Dkt. No. 40 at 38 ¶¶ 8, 9).

The CI called Defendant from jail after his arrest by the New Bedford police on or about May 21, 2019 (Dkt. No. 40 at 2-4, 38 ¶ 10).  The CI told Defendant that "'he couldn't do any more time in,' he couldn't bear being in jail, and . . . he was 'going to try to get out any way he could'" (Dkt. No. 40 at 38 ¶ 10).  The CI called Defendant frequently thereafter (Dkt. No. 40 at 38 ¶ 11).  During one jail call, the CI asked Defendant to get "those toys," and referred to a "45" and "chrome" (Dkt. No. 40 at 38 ¶ 11).  Defendant realized that the CI was using the code word "toys" to refer to the firearms that he had asked Defendant to retrieve from his home before his arrest (Dkt. No. 40 at 38-39 ¶ 11).

2

Notwithstanding the CI's continued pressure on Defendant to go to New Bedford to pick up the "'toys,'" Defendant refused because he did not want to possess guns at his home in Springfield (Dkt. No. 40 at 38-39 ¶¶ 11, 12).  About a month after the CI first called Defendant from jail, he told Defendant that he was "in dire need of money for bail and wanted to sell the guns to somebody, but first he needed to get them out of New Bedford and away from his family and kids" (Dkt. No. 40 at 39 ¶ 13).  The CI told Defendant that one of his "associate[s]" would deliver the firearms to Defendant in Springfield (Dkt. No. 40 at 39 ¶ 13).  Although Defendant did not want to take possession of the firearms, he interpreted the CI's comment, "'You have to do me this solid,'" as an appeal to Defendant's obligation to repay the CI for his financial assistance after Defendant's release from prison and as "a threat" to the safety of Defendant and his family if he refused the CI's request (Dkt. No. 40 at 39-41 ¶¶ 13-16, 20).  Within a short time after the CI told Defendant he "had to do him the solid" of storing his guns, one of the CI's associates delivered them to Defendant's garage (Dkt. No. 40 at 40 ¶ 17).  Defendant understood that he would store the guns for the CI until he found a buyer (Dkt. No. 40 at 39 ¶ 15).

According to the government, while the CI was incarcerated pending trial, he offered New Bedford Police Detective Jason Gangi information concerning firearms that he had transferred to another person (Dkt. No. 44 at 1, 5).  On June 26, 2019, Detective Gangi and an agent from the Bureau of Alcohol, Tobacco, and Firearms ("ATF") interviewed the CI pursuant to a proffer agreement (Dkt. No. 44 at 2).  The CI's proffer stated that, "to avoid the risk of keeping the firearms at [his] home, [he] had given three firearms, two handguns and a rifle, to . . . [D]efendant, with the understanding that . . . [D]efendant could use the firearms, but that eventually the [CI] would want them returned" (Dkt. No. 44 at 2).

During a telephone call on July 2, 2019, the CI told Defendant that a buyer would contact him about retrieving the firearms and would pay the CI for them (Dkt. No. 40 at 40 ¶ 18; Dkt. No. 44 at 2).  Defendant received a text message from the CI's alleged associate a few days later indicating that he would pick up the firearms (Dkt. No. 40 at 40 ¶ 19; Dkt. No. 44 at 2).  On July 5, 2019, Defendant transferred three firearms and ammunition to the CI's alleged associate, an undercover law enforcement officer, who handed Defendant some cash (Dkt. No. 4; Dkt. No. 40 at 40 ¶ 19; Dkt. No. 44 at 2-3).  The transaction was audio and video recorded (Dkt. No. 44 at 3).

Defendant alleges that he only agreed to store the CI's guns at his home for a short time "out of [his] moral debt to him, [his] concern about his family, and [Defendant's] fear of what he might do to [his] family and [him] should [he] refuse to store the weapons for him" (Dkt. No. 40 at 41 ¶ 20).

B.    The CI's History

Portions of the CI's history of involvement with the criminal justice system, including his May 2019 arrest by the New Bedford police and his subsequent conviction on the charges that led to his arrest, are relevant to Defendant's motion.[1]  In May 2016, about a year after the CI's release from MCI-Norfolk, he was charged with committing a narcotics offense for which he received a sentence of probation in 2018 (Dkt. No. 40 at 33 [sealed]).

---

[1] Although the information concerning the CI's May 2019 arrest and conviction were filed under seal to protect the CI's identity, the court's recitation of the crimes with which the CI was charged and the resolution of those charges are gleaned from public court records, the Application for Criminal Complaint and the docket of the New Bedford District Court, without referencing the CI's identity (Dkt. No. 40 at 23-28).  *See Attorney Gen. v. Dist. Attorney for Plymouth Dist.*, 141 N.E.3d 429, 440 (Mass. 2020) ("'if the item sought is a court record that could be obtained from the clerk's office, it is a public record . . . .'") (quoting *Globe Newspaper Co. v. Dist. Attorney for the Middle Dist.*, 788 N.E.2d 513, 520 (Mass. 2003)).

On May 21, 2019, the CI was arraigned in the New Bedford District Court on the following charges that stemmed from the CI's participation in a masked armed robbery and shooting of a victim in a New Bedford apartment on February 20, 2019 (Dkt. No. 40 at 2-5, 24): assault and battery causing serious bodily injury, in violation of Mass. Gen. Laws ch. 265, § 13A(b)(i) (Count 1); armed robbery with a firearm while masked, in violation of Mass. Gen. Laws ch. 265, § 17 (Count 2); discharging a firearm within 500 feet of a dwelling, in violation of Mass. Gen. Laws ch. 269, § 12E (Count 3); assault and battery by means of a firearm, in violation of Mass. Gen. Laws ch. 265, § 15E (Count 4); assault with intent to rob while armed with a firearm, in violation of Mass. Gen. Laws ch. 265, § 18(b) (Count 5); accessory before the fact, in violation of Mass. Gen. Laws ch. 274, § 2 (Count 6); and accessory after the fact, in violation of Mass. Gen. Laws ch. 274, § 4 (Count 7) (Dkt. No. 40 at 23-24).

After the probable cause hearing was continued five times, the CI pled guilty to Counts 1, 2, 4, and 5 in the New Bedford District Court on November 27, 2019 (Dkt. No. 40 at 25-27).[2] On Count 4, which charged assault and battery by means of a firearm, the CI received a split sentence of two and one-half years to the house of correction, with 187 days to be served and the balance suspended (Dkt. No. 40 at 28). The CI received credit for the 187 days that he was held in confinement while awaiting trial (Dkt. No. 40 at 28). On Count 5, which charged assault with

---

[2] A probable cause hearing is scheduled at arraignment in a case that is not within the jurisdiction of the district court, *see Commonwealth v. Perkins*, 981 N.E.2d 630, 633 n.4 (Mass. 2013) (citing Mass. R. Crim. P. 7(b)(4)), and is "to be held as soon as reasonably practicable in the circumstances presented." *Id.* at 639. *See* Mass. Gen. Laws ch. 276, § 38. The proceeding is intended to "prevent the defendant from being held on a groundless or unmeritorious charge." *Perkins,* 981 N.E.2d at 640.

!

intent to rob while armed with a firearm, the court imposed the same split sentence that was

imposed on Count 4, to run concurrently with the Count 4 sentence (Dkt. No. 40 at 28).   On

Count 1, the CI pled guilty to so much of the original offense of assault and battery causing

serious bodily injury as charged the lesser crime of assault and battery, in violation of Mass.

Gen. Laws ch. 265, § 13A(a), and on Count 2, he pled guilty to so much of armed robbery with a

firearm while masked as charged larceny from a person, in violation of Mass. Gen. Laws ch.

266, § 25(b) (Dkt. No. 40 at 28).   The CI received concurrent sentences of probation on those

convictions (Dkt. No. 40 at 28).   Counts 3, 6 and 7 were dismissed at the prosecution's request

(Dkt. No. 40 at 27).

      C.    Defendant's Discovery Requests and the Government's Responses

On March 4, 2020, Defendant requested discovery concerning the CI including:

8.      All reports, memoranda, or other materials documenting any debriefing, discussion or conversation between agents and [the CI] regarding [Defendant];

9.      All of [the CI's] communications to law enforcement or government personnel prior to, during, and subsequent to [Defendant's] arrest;

10.    All reports, memoranda, or other materials regarding [the CI's] own acquisition of the firearms at issue; [and]

11.    All materials documenting [the CI's] efforts and attempted efforts to have [Defendant] take possession of and then later transfer the firearms at issue[.]

(Dkt. No. 40 at 43-45).

In response to Defendant's discovery requests ## 8, 10, and so much of 11 as requested

information on the CI's participation in Defendant's transfer of the firearms to the undercover

officer, the government provided two ATF Reports of Investigation ("ROI"), which documented

contact with the CI on June 26, 2019 and July 3, 2019 (Dkt. No. 40 at 48; Dkt. No. 44 at 3, 5).

ROI # 1 contained the CI's June 26, 2019 proffer in which he indicated that he received the

firearms from a drug user, suspected they were stolen, and identified Defendant as the person to whom he had transferred them (Dkt. No. 44 at 2, 3, 6).  The report also included the CI's description of his July 2, 2019 phone calls with Defendant from the jail when the CI told Defendant that one of his associates would contact Defendant to arrange to retrieve the firearms (Dkt. No. 44 at 2, 3).  The government provided Defendant with recordings of those two jail calls (Dkt. No. 40 at 48-49; Dkt. No. 44 at 2, 3).  ROI # 2 described New Bedford Police Detective Gangi's July 3, 2019 interview of the CI when the CI identified a photograph of the Defendant as the person to whom he had transferred the firearms and described the firearms in more detail (Dkt. No. 44 at 2, 3).

In response to # 11's request for information concerning the CI's initial transfer of the firearms to Defendant, the government stated that it made inquiries of the ATF agent assigned to the case and New Bedford Police Detective Gangi (Dkt. No. 44 at 1, 6).  The government reported that "neither entity" was in possession of material beyond that which previously was produced because "neither entity was involved with the C[I]'s efforts to have . . . [D]efendant take possession of the firearms" (Dkt. No. 44 at 6).

In response to Defendant's request # 9, the government declined to provide information beyond the two ROIs "on the grounds that such information is beyond the scope of discovery required at this time pursuant to Rule 16 and Local Rule 116 and is not relevant to this case" (Dkt. No. 40 at 48).  Defendant now moves to compel the government to respond to request # 9 by producing the New Bedford Police Department's ("NBPD") informant file(s) on the CI on the grounds that any such file is likely to contain agreements between the NBPD and the CI, details of the NBPD's use of the CI in prosecutions, and information about "misconduct during the [CI's] career as an informant" (Dkt. No. 36 at 5).

III.    DISCUSSION

Relying on *Brady v. Maryland (Brady),* 373 U.S. 83 (1963), Fed. R. Crim. P. 16(a)(1)(E),

and LR 116.1(c)(1)(A) and 116.2(b)(1)(A), Defendant asserts that any NBPD informant files on

the CI are potentially exculpatory and are material to the adequate investigation and preparation

of an entrapment defense.  The government counters that it has provided Defendant with all

relevant material, the information Defendant seeks is protected by the informer's privilege and,

even if it is not protected, Defendant has failed to meet the requisite showing for an entrapment

defense that would require production of the CI's file (Dkt. No. 44 at 6-9).  In view of the

information contained in Defendant's affidavit and the CI's historical relationship with law

enforcement, Defendant has demonstrated that he is entitled to discover the NBPD informant

file(s) on the CI in order to explore the viability of an entrapment defense.

A.    The Entrapment Defense

"Entrapment occurs 'when the criminal design originates with the officials of the

government, and they implant in the mind of an innocent person the disposition to commit the

alleged offense and induce its commission in order that they may prosecute.'"  *United States v.

Gamache,* 156 F.3d 1, 9 (1st Cir. 1998) (quoting *Sorrells v. United States,* 287 U.S. 435, 442

(1932)).  "The policy behind the entrapment defense seeks to deter the government from such

zeal in pursuing a conviction that its efforts result in the commission of a crime that likely would

not have occurred if the suspect had been left to his own devices." *United States v. Joost*, 92

F.3d 7, 12 (1st Cir. 1996) (citing *Jacobson v. United States,* 503 U.S. 540, 553-54 (1992)).  "To

mount a viable claim of entrapment, a defendant must make a threshold showing on two

elements:  first, that government agents induced the crime with which the defendant was

charged, *United States v. Acosta,* 67 F.3d 334, 337 (1st Cir. 1995); and second, that the

defendant was not already predisposed to commit the crime, *United States v. Rogers,* 102 F.3d 641, 645 (1st Cir. 1996)." *United States v. Roszkowski*, 700 F.3d 50, 54 (1st Cir. 2012).  *See United States v. Rodriguez,* 858 F.2d 809, 813-14 (1st Cir. 1988).  Put another way, "the defendant has an entry-level burden of production, which requires him to furnish '"some hard evidence" that "governmental actors induced [him] to perform a criminal act that he was not predisposed to commit."'"  *United States v. Montoya*, 844 F.3d 63, 66 (1st Cir. 2016) (quoting *United States v. Shinderman,* 515 F.3d 5, 14 (1st Cir. 2008) (alteration in original)).  If the defendant meets his burden, the government is required to prove beyond a reasonable doubt that at least one of the following is true:  "either (1) 'no government agent or person acting on behalf [of] or . . .  under the auspices of the government persuaded or induced the defendant to commit the charged crimes; or (2) the defendant was ready and willing to commit the [charged] crime[s] without persuasion from the government.'"  *Pesaturo,* 519 F. Supp. 2d at 184 (alterations in original) (quoting *United States v. Luisi,* 482 F.3d 43, 50 (1st Cir. 2007)).

Notwithstanding the government's contrary contention, Defendant's sworn statements and the materials that he has submitted concerning the CI's relationship with law enforcement satisfy his burden to make a "'prima facie showing'" on the two threshold elements of an entrapment defense (Dkt. No. 44 at 7-8).  *Montoya,* 844 F.3d at 66 (quoting *Shinderman,* 515 F.3d at 14). *See Joost,* 92 F.3d at 12 ("In order to be entitled to an entrapment instruction, the [d]efendant has the burden of producing 'some evidence' 'on both elements sufficient to raise a reasonable doubt as to whether he was an 'unwary innocent' rather than an 'unwary criminal.'") (quoting *United States v. Hernandez,* 995 F.3d 307, 313 (1st Cir. 1993)); *Rodriguez,* 858 F.2d at 814 ("a defendant is entitled to a jury instruction on entrapment if there is record evidence which fairly

supports the claims of both government inducement of the crime and defendant's lack of predisposition to engage in it.").

Defendant's affidavit establishes that the CI induced him to accept the firearms and that he lacked a predisposition to commit the crime (Dkt. No. 36 at 1; Dkt. No. 44 at 7-8).  "To demonstrate inducement [under the first prong of the defendant's threshold burden], a defendant must show not only that the government provided [him] with [an] opportunity to commit the crime, but also the existence of a 'plus' factor that raises concerns of 'government overreaching.'" *United States v. Vasco,* 564 F.3d 12, 18 (1st Cir. 2009) (quoting *United States v. Gendron,* 18 F.3d 955, 961-62 (1st Cir. 1994)).  "Examples of overreaching include 'intimidation, threats, dogged insistence [and] excessive pressure.'"  *Id.* (citations omitted).  Defendant has demonstrated those plus factors.  *See id.*  In view of Defendant's knowledge of the CI's history of violence, Defendant believed that the CI posed a threat to him and his family if he did not agree to store the CI's guns (Dkt. No. 40 at 37 ¶ 3, at 39 ¶ 14, at 40-41 ¶¶ 16, 20).  In addition, Defendant avers that the CI "refused to take 'no' for an answer" until Defendant agreed to accept delivery of the firearms (Dkt. No. 40 at 39 ¶¶ 12, 13, at 40-41 ¶ 20).  *United States v. Diaz-Maldonado,* 727 F.3d 130, 137 (1st Cir. 2013).  As to the second prong of the threshold showing, Defendant asserts that the CI appealed to their friendship, particularly the CI's past financial assistance, to persuade Defendant to accept delivery of the firearms (Dkt. No. 40 at 38 ¶ 7, at 39-41 ¶¶ 13, 14, 15, 20).  *See Montoya,* 844 F.3d at 67; *Diaz-Maldonado,* 727 F.3d at 138.  The CI also "played upon" Defendant's sympathy toward the CI's family (Dkt. No. 40 at 39-41 ¶¶ 13, 15, 20).  *United States v. Terry*, 240 F.3d 65, 68 (1st Cir. 2001).   !

In addition to showing inducement and the absence of a predisposition, in order raise an entrapment defense, Defendant is required to show that the CI was acting as a government agent

or at the direction of the government when he allegedly induced Defendant to accept the firearms in June 2019.  "[I]f the initiator of the criminal activity is not a government agent the defense of entrapment does not apply."  *United States v. Romano,* 278 F.2d 202, 204 (2d Cir. 1960).  *See Lopez v. United States,* 373 U.S. 427, 434 (1963) ("The conduct with which the defense of entrapment is concerned is the manufacturing of crime by law enforcement officials and their agents."); *United States v. Garcia*, 546 F.2d 613, 615 (5th Cir. 1977) ("Entrapment cannot result from the inducements of a private citizen but must be the product of conduct by governmental agents.").

Defendant has made a sufficient showing on the agency element.  According to records submitted by Defendant, the CI was an active informant for the NBPD when he committed crimes in February 2019 and when he was arrested and jailed on the charges stemming from those crimes on or about May 21, 2019 (Dkt. No. 36 at 2 (citing Dkt. No. 40 at 2-5, 6 [sealed])).[3] Defendant claims that the CI arranged to transfer the firearms to him "about a month after" the CI first called from the jail (Dkt. No. 40 at 38-40 ¶¶ 10-17).  The undercover law enforcement agent retrieved the firearms from Defendant on July 5, 2019 (Dkt. No. 4; Dkt. No. 40 at 40 ¶¶ 18, 19).  About five months later, the CI received a remarkably favorable disposition of his pending felony charges.

Although the CI was charged with two felonies that mandated state prison sentences of five years or more upon conviction and over which the New Bedford District Court did not have jurisdiction, the charges were favorably resolved in the district court on November 27, 2019.  *See*

_____

[3] A report indicates that the CI was working with another NBPD detective, not Detective Gangi, in February 2019 (Dkt. No. 40 at 6 [sealed]).  It is unclear whether the government sought information concerning the CI's informant status from that other NBPD detective.

11

Mass. Gen. Laws ch. 218, § 26 ("The district courts . . . shall have original jurisdiction, concurrent with the superior court, of . . . all felonies punishable by imprisonment in the state prison for not more than five years . . . ."); Mass. Gen. Laws ch. 274, § 1 (a crime that is punishable by imprisonment in state prison is a felony).  The CI was charged with committing armed robbery with a firearm while masked, which required the imposition of a state prison sentence of not less than five years, *see* Mass. Gen. Laws ch. 265 § 17, and assault with intent to rob while armed with a firearm, which mandated the imposition of a state prison sentence of not less than five years and not more than twenty years, *see* Mass. Gen. Laws ch. 265, § 18(b) (Dkt. No. 40 at 24, 27, 28).  Notwithstanding the district court's lack of jurisdiction over those charges, *see* Mass. Gen. Laws ch. 218, § 26; *Commonwealth v. Woolford,* 108 Mass. 483, 484 (1871) (a court's jurisdiction exists only where both maximum and minimum penalties are within its authority), the CI's case remained in the district court where the scheduled preliminary hearing to bind the case over to the superior court was repeatedly continued and where the CI was sentenced to serve 187 days, which was the time he had already served while awaiting trial (Dkt. No. 40 at 28).[4]  The CI's history as an informant and his release from incarceration on the date of

---

[4] On Count 2, which charged robbery while masked and armed with a firearm, in violation of Mass. Gen. Laws ch. 265, § 17, the CI pled guilty to the lesser offense of larceny from a person, in violation of Mass. Gen. Laws ch. 266, § 25(b), over which the district court had jurisdiction (Dkt. No. 40 at 28, 29).  According to the district court docket, Count 5 charged the CI with assault with intent to rob while armed with a firearm, in violation of Mass. Gen. Laws ch. 265, § 18(b) (Dkt. No. 40 at 24, 27, 28).  Because a conviction of that offense required imposition of a state prison sentence "for not less than five years and not more than 20 years," !Mass. Gen. Laws ch. 265, § 18(b), the district court did not have jurisdiction of that charge.  *See* Mass. Gen. Laws ch. 218, § 26.  Although the docket does not appear to reflect the CI's conviction of an offense over which the district court had jurisdiction on Count 5, it is the CI's concurrent sentence of time served, which is reflected on the docket, that is relevant to the resolution of Defendant's motion (Dkt. No. 40 at 28).  *See Commonwealth v. Rodgers*, 862 N.E.2d 727, 730 (Mass. 2007) ("The docket and the clerk's minutes are prima facie evidence of the facts recorded therein . . . .").

his guilty plea to two serious felony charges constitute evidence that the CI was a government

agent when he set up Defendant to accept his firearms in June 2019. *See Sherman v. United

States,* 356 U.S. 369, 374-75 (1958) (an informant, who had recently instigated two other

prosecutions while awaiting sentencing on a conviction and who ultimately received a favorable

sentence, was deemed to be a government agent when he induced the defendant to sell narcotics

as "part of a course of conduct" notwithstanding the government's lack of knowledge of the

informant's interactions with the defendant when he made the sale); *United States v. O'Dell,* No.

95-1069, 1995 WL 765231, at *2 (7th Cir. Dec. 27, 1995) (unpublished) ("law enforcement

officials and informants often develop ongoing symbiotic relationships."); *United States v.

Salemme,* 978 F. Supp. 343, 360 (D. Mass. 1997) (favorable treatment from law enforcement

was circumstantial evidence of cooperation with the government).

The evidence suggesting that the CI was a government agent when he induced Defendant

to commit the crime plus the evidence showing the absence of Defendant's predisposition is

sufficient to entitle Defendant to discover the information he seeks to pursue his development of

an entrapment defense. *Compare Pesaturo,* 519 F. Supp. 2d at 192 (denying the defendant's

request for materials relating to the informant's cooperation in other cases where the informant's

status as a government agent was not at issue).

B.    The *Roviaro* Standard

Although the government does not dispute that Defendant knows the CI's identity, it

claims that Defendant has failed to sustain his burden of demonstrating a compelling need for

disclosure of the requested information that outweighs the government's interest in safeguarding

the CI's personal safety (Dkt. No. 44 at 6-8).  *See Roviaro v. United States,* 353 U.S. 53, 60-61 (1957).

"The [g]overnment enjoys a privilege authorizing it to withhold the identity of confidential informants who give law enforcement officers information relating to violations of the law." *Pesaturo,* 519 F. Supp. 2d at 185 (quoting *Roviaro,* 353 U.S. at 59).  "The privilege recognizes the obligation of citizens to communicate their knowledge of the commission of crimes to law-enforcement officials and, by preserving their anonymity, encourages them to perform that obligation." *Roviaro,* 353 U.S. at 59.  However, "[w]here the disclosure of an informer's identity, or of the contents of his communication is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the privilege must give way." *Id.* at 60-61.  In determining whether an informant's information should be revealed, the court balances "the public interest in protecting the flow of information" and the informant's interest in protecting his or her safety against the defendant's right to receive evidence that will guarantee him a fair trial. *Id.* at 62.  *See Pesaturo,* 519 F. Supp. 2d at 185-86.  Whether, on balance, disclosure is warranted depends on consideration of the particular circumstances of each case, specifically "[1] the crime charged, [2] the possible defenses, [3] the possible significance of the informer's testimony, and [4] other relevant factors." *Roviaro,* 353 U.S. at 62.

Defendant has met his burden of demonstrating that his need for information concerning the informant in order to present an entrapment defense outweighs the government's interest in safeguarding the CI. *See United States v. Tzannos,* 460 F.3d 128, 139 (1st Cir. 2006) (defendant, "as the party seeking disclosure, [bears] the burden of persuasion in the analysis.").  Defendant is charged with being a convicted felon who knowingly possessed firearms and ammunition. *See United States v. Carpenter,* 403 F.3d 9, 10 (1st Cir. 2005).  Defendant has admitted that he has a

prior felony conviction and, as to the element of possession, there is a videotape of him

transferring the firearms to an undercover officer on July 5, 2019 (Dkt. No. 40 at 37 ¶ 2).

"Entrapment, if he [can] prove it, [may be] his only hope." *DiBlasio v. Keane*, 932 F.2d 1038,

1042 (2d Cir. 1991).

Initially, Defendant must produce some evidence of entrapment before an analysis under

*Roviaro* can be undertaken. *See United States v. Gonzales*, 606 F.2d 70, 75 (5th Cir. 1979)

("Unless some evidence of entrapment is adduced by the defendant, thereby properly raising the

defense, disclosure [of privileged information] would be unjustifiable."). For the reasons

previously discussed, Defendant has presented sufficient evidence on the two threshold elements

of entrapment to warrant disclosure of privileged information.

Defendant's prima facie showing shifts the burden to the government to prove beyond a

reasonable doubt either the absence of inducement by a government agent or Defendant's

predisposition to commit the crime. *See Pesaturo*, 519 F. Supp. 2d at 192. Defendant's sworn

affidavit, if believed, establishes that the CI improperly induced him to possess the firearms and

that he lacked a predisposition to engage in criminal conduct (Dkt. No. 40 at 40-41 ¶ 20). *See id.*

Consequently, whether or not the CI was a government agent when he set up the transfer of

firearms to Defendant will be a central issue at trial. Because the government will likely argue

that the CI was a private citizen and, therefore, the defense of entrapment fails, Defendant has

borne his burden of showing that he needs the requested information to refute the government's

contention concerning the CI's status and to prove entrapment.

In addition, Defendant claims that if the government does not call the CI as a witness in

Defendant's case, he "likely" will call him (Dkt. No. 36 at 7). *See DiBlasio*, 932 F.2d at 1042

("the defendant should have an opportunity to present an informant's testimony in order to

develop an entrapment defense.") (citation omitted).  The CI's testimony would be helpful to establish an entrapment defense if it corroborated Defendant's contentions concerning his relationship with the CI including the CI's financial assistance, persistent attempts to induce Defendant to commit crimes before the CI's incarceration in May 2019, and desire to remove the firearms from his family's home in New Bedford (Dkt. No. 40 at 37-38 ¶¶ 6, 8, 9).  *See id.* at 1043 (finding the informant's testimony concerning his conversations with the defendant before the sale to the undercover officers to be "'relevant and material' to the case" and "'helpful to the defense'" if it corroborated defendant's version of events).  Assuming that the CI's telephone conversations with Defendant were recorded after the CI was incarcerated in May 2019, the CI may be the only witness to their conversations before that date.  *See id.*  In order to determine whether or not the CI's testimony will assist the defense, Defendant will need to be armed with the requested information in order to assess the CI's credibility.  *See, e.g. Lema v. United States*, 987 F.2d 48, 54 (1st Cir. 1993) ("The decision whether to call a particular witness is almost always strategic, requiring a balancing of the benefits and risks of the anticipated testimony.").

The concerns for the CI's safety are adequately addressed by the protective order that has been entered in this case, which restricts Defendant's access to confidential information and his ability to distribute it (Dkt. Nos. 30, 34).  The NBPD information that the government produces should be marked as confidential.  Defendant is permitted to review confidential information only in his counsel's presence )or virtual presence in view of the current pandemic).  In addition, Defendant "may not copy, keep, maintain, or otherwise possess" any confidential information in the case "at any time" and confidential information will be never be "left in [his] possession, custody, or control . . . whether he is incarcerated or not."

In sum, Defendant has demonstrated a need for the NBPD's informant file(s) on the CI that outweighs the government's reason for withholding it.

      C.    <u>*Brady* and Rule 16(a)(1)(E)</u>

The government does not dispute that evidence of entrapment by a government agent is exculpatory under *Brady*.  However, it contends that the information that Defendant seeks is not material under either *Brady* or Fed. R. Crim. P. 16(a)(1)(E)(i) (Dkt. No. 44 at 4-6).

"Under *Brady,* the [g]overnment must produce exculpatory evidence which is material to guilt or punishment."  *Pesaturo,* 519 F. Supp. 2d at 189.  Evidence is exculpatory if it has the potential to cast doubt on the Defendant's guilt or the potential to negate the defendant's guilt of an essential element of the prosecution's case.  *See id.* at 187 n.4.  "Evidence is 'material' for these purposes only if there is a reasonable probability that it could affect the outcome of the trial."  *United States v. Tsarnaev,* Criminal Action No. 13-10200-GAO, 2013 WL 6196279, at *1 (D. Mass. Nov. 27, 2013) (quoting *United States v. Bagley,* 473 U.S. 667, 682 (1985)).

In relevant part, Fed. R. Crim. P. 16(a)(1)(E) provides:

> Upon a defendant's request, the government must permit the defendant to inspect and to copy or photograph books, papers, documents, data, photographs, tangible objects, buildings or places, or copies or portions of any of these items, if the item is within the government's possession, custody, or control and:
>
> (i) the item is material to preparing the defense; . . .

Fed. R. Cr. P. 16(a)(1)(E)(i).  In order to obtain discovery under the rule, Defendant must show that the NBPD's informant file(s) on the CI is material to preparing his defense, *see United States v. Carrasquillo–Plaza,* 873 F.2d 10, 12–13 (1st Cir. 1989), meaning that Defendant must demonstrate that disclosure of the material he seeks will "significantly . . . alter the quantum of proof in his favor."  *United States v. Ross,* 511 F.2d 757, 763 (5th Cir. 1975).  *See United States v. Santana,* 83 F. Supp. 2d 224, 232 (D.P.R. 1999).  Although demonstrating materiality "is not a

heavy burden," *United States v. George,* 786 F. Supp. 56, 58 (D.D.C. 1992), "'[a] general description of the materials sought or a conclusory argument as to their materiality is insufficient.'"  *Carrasquillo–Plaza,* 873 F.2d at 13 (quoting *United States v. Cadet,* 727 F.2d 1453, 1466 (9th Cir. 1984)).

In view of Defendant's detailed sworn affidavit and his proffered information concerning the CI's relationship with law enforcement, Defendant has met his burden of demonstrating that the requested information is material to the defense.[5]  *See Pesaturo,* 519 F. Supp. 2d at 191 ("Without evidence of the terms of the informant's relationship with the [g]overnment, i.e. any evidence establishing the [CI's status as a government agent] in this case, there is a reasonable possibility of a different outcome.").

Accordingly, Defendant's motion for discovery of the NBPD's informant file(s) on the CI is allowed.  Because Defendant alleges that the CI was incarcerated until "sometime in the summer of 2015" (Dkt. No. 40 at 37 ¶ 4), Defendant is entitled to discover the records contained in any NBPD informant file on the CI that cover the period from the date the CI was released from incarceration in 2015 until the present.

---

[5] The government makes a passing reference to the fact that the material Defendant requested is not in the government's custody or control as required for production under *Brady* and Rule 16 (Dkt. No. 44 at 4).  *See United States v. Sepulveda,* 15 F.3d 1161, 1179 (1st Cir. 1993).  However, "a prosecutor's office cannot get around *Brady* by keeping itself in ignorance, or by compartmentalizing information about different aspects of a case." *Carey v. Duckworth,* 738 F.2d 875, 878 (7th Cir. 1984).  Here, because the CI was working with the NBPD and because NBPD Detective Gangi began the investigation into Defendant's possession of the firearms and ammunition and, then, participated with the ATF, the NBPD's file(s) on the CI are "'closely aligned'" with the prosecution of Defendant's case and should be produced (Dkt. No. 44 at 2). *United States v. Brooks,* 966 F.2d 1500, 1503 (D.C. Cir. 1992) (citation omitted).  *See United States v. Murray,* Case No. 3:18-cr-30018-MGM-1, 2019 WL 1993785, at *3 (D. Mass. May 6, 2019); *United States v. Ramos-Cartagena,* 9 F. Supp. 2d 88, 91 (D.P.R. 1998) (citing *United States v. Upton,* 856 F. Supp. 727, 750 (S.D.N.Y. 1994)).

IV.   CONCLUSION

For the reasons stated herein, so much of Defendant's Motion to Compel Disclosure of Witness Information (Dkt. No. 36) as requests the material contained in the NBPD's informant file(s) on the CI that covers the period from the date the CI was released from incarceration to the present is allowed subject to the protective order that was entered in this case on May 27, 2020.  As to Defendant's other requests, the motion is denied.

It is so ordered.

Date:   July 17, 2020                                  /s/ Katherine A. Robertson
                                                       KATHERINE A. ROBERTSON
                                                       United States Magistrate Judge